UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUPER PERFECT INVESTMENTS LTD,<br>    Hopewell Centre, Level 54<br>    183 Queen's Road East<br>    Hong Kong<br><br>                                 Petitioner.<br><br>               -against-<br><br>AGROINVESTBANK OPEN JOINT STOCK COMPANY<br>    Avenue Saadi Sherzoi 21<br>    734018 Dushanbe<br>    Republic of Tajikistan<br><br>                                 Respondent. | Case No. 20-cv-05552 |

**PETITION TO RECOGNIZE AND ENFORCE ARBITRATION AWARD**

Petitioner Super Perfect Investments LTD ("Super Perfect"), by and through undersigned counsel, hereby petitions this court for an order and judgment:

    i)      recognizing and enforcing a July 17, 2017 Award (the "Award") rendered in the arbitration between Petitioner Super Perfect and Respondent Agroinvestbank OJSC ("AIB");

    ii)     entering judgment in Super Perfect's favor against AIB in the amount of the Award with interest; and

    iii)    granting Super Perfect such relief as the Court deems just and proper.

The Petition is supported by the Declaration of Alois Schonberger ("Schonberger Decl.") dated July 17, 2020, and the exhibits thereto, and the accompanying Memorandum of Law. A certified copy of the Award is attached as Exhibit 1 to the Schonberger Declaration, and shall be cited as "CA" followed by the relevant paragraph numbers.

## INTRODUCTION

1. Super Perfect prevailed in an international arbitration against AIB that was seated in Geneva, Switzerland, in the Swiss Chambers' Arbitration Institution. Petitioner brings this proceeding under Section 207 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 207, and Article III of the United Nations Convention for the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, (the "New York Convention"), to confirm, recognize and enforce a final, binding arbitration Award made on July 17, 2017, by an arbitrator in the matter *Super Perfect Investments Ltd v. Agroinvestbank OJSC*, Case no 300310-2014. The arbitration was conducted in accordance with the arbitration provision set forth in a guarantee requested by Super Perfect and granted by AIB. The provision specified that arbitration shall proceed by the Swiss Rules of International Arbitration of the Swiss Chamber of Commerce, and this proceeding did. Respondent submitted to the jurisdiction of the tribunal.

2. The Award is final and enforceable under the New York Convention.

3. The United States is a party to the New York Convention and implemented it pursuant to chapter 2 of Title 9 of the U.S. Code.

4. In accordance with the express mandate of Congress and the obligations assumed by the United States under the New York Convention, this Court must enforce the Award "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specific in the said Convention." 9 U.S.C. § 207.

5. The New York Convention specifies extremely limited grounds for refusing to enforce an Award; no ground barring enforcement exists here. Accordingly, Super Perfect is entitled to entry of a judgment as requested.

**PARTIES, JURISDICTION, AND VENUE**

6. Petitioner Super Perfect is a corporation organized under the laws of Hong Kong.

7. Respondent AIB is a bank organized under the laws of Tajikistan. It is owned and controlled by the government of Tajikistan; the Ministry of Finance owns 87.3% of the shares of AIB. Mr. Murodali Alimardon, Tajikistan's former Deputy Prime Minister, directed all aspects of AIB's activities with respect to the events giving rise to the arbitration. Mr. Alimardon has been Chairman of AIB since 2015, and he and the government of Tajikistan have continued to control AIB.

8. This Court has jurisdiction over the subject matter of this proceeding under 9 U.S.C. § 203, which provides that the "district courts of the United States . . . have original jurisdiction over 'any' action or proceeding falling under the [New York] Convention." This proceeding "fall[s] under the Convention," because the Award arose out of commercial contracts between Petitioner and Respondent—the guarantees, as further described herein—neither of which is a citizen of the United States. *See* 9 U.S.C. § 202 (providing that an arbitral award "arising out of a legal relationship . . . which is considered as commercial . . . falls under the Convention" unless the relationship was "entirely between citizens of the United States"). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331(f) and 28 U.S.C. § 1330.

9. This Court also has *quasi in rem* jurisdiction to hear the Petition and enforce the Award because AIB maintains property in this District in the form of a bank account at Citibank N.A., 399 Park Avenue, New York, NY 10043, as reflected on AIB's website. (Schonberger Decl. ¶ 4, Ex. 2). This bank account was identified in the underlying sales contract; it was the account to which Super Perfect made its payment in U.S. dollars; it is the account from which

Super Perfect expected AIB to make the U.S. dollar payment provided for in the guarantees; and it is the account that contains a substantial part of the property in dispute. (*Id.* ¶ 5, Ex. 3).

10. Venue is proper in this District because the underlying contracts directed Super Perfect to make U.S. dollar payments through AIB's bank account in this District, located at Citibank N.A., 399 Park Avenue, New York, NY 10043. Super Perfect made those payments to that account, and holds U.S. dollar-denominated guarantees, which it expects to be paid from that account. The assets in that account constitute property that is the subject of this dispute, and which Petitioner intends to attach once it obtains a judgment recognizing its Award. 9 U.S.C. § 204; 28 U.S.C. § 1391(f)(1). Venue is proper where a prevailing party in an arbitration seeks to attach assets in satisfaction of its award. *Metro. World Tanker, Corp. v. P. N. Pertambangan Minjakdangas Bumi Nasional (P. M. Pertamina)*, 427 F. Supp. 2, 4 (S.D.N.Y. 1975).

11. AIB is an instrumentality of a foreign state under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 et seq., because at all relevant times its was owned and controlled by the Republic of Tajikistan. This Court has personal jurisdiction over AIB as an agency or instrumentality of Tajikistan under 28 U.S.C. § 1330(b), which confers "[p]ersonal jurisdiction over a foreign state" and any "agency or instrumentality" thereof "as to every claim for relief" for which the foreign state does not enjoy sovereign immunity under 28 U.S.C. §§ 1605–1607, and over which the Court has subject matter jurisdiction. 28 U.S.C. § 1330(b); 28 U.S.C. § 1603(a)-(b).

12. AIB is not immune from the jurisdiction of this Court for purposes of this Petition because FSIA denies immunity to foreign states (or their instrumentalities, as defined in 28 U.S.C. § 1603(a)) in an action to recognize an arbitral award governed by the New York

Convention.  Specifically, FSIA provides that a foreign state (or its instrumentality) is not immune to jurisdiction in a suit:

> either to enforce an agreement made by the foreign state with or for the benefit of a private party . . . or to confirm an award made pursuant to such an agreement to arbitrate, if  . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards.

28 U.S.C. § 1605 (a)(6).  The Award is governed by the New York Convention, which is a treaty in force in the United States.  9 U.S.C. § 201.  Respondent also lacks immunity relating to its obligations under the guarantees because they arise out of ordinary commercial activities.  28 U.S.C. § 1605(a)(2).

## BACKGROUND

### *a.  The Guarantees and Respondent's Failure to Perform*

13. The Award arises out of a dispute concerning guarantees issued by AIB in favor of Petitioner with respect to two contracts for the purchase of 20,000 metric tons of cotton from Levakan-M LLC ("Levakan"), a Tajik company.  (CA ¶ 127).  On December 6, 2012, representatives of Petitioner, Levakan and AIB met in the office of then-Deputy Prime Minister Mr. Murodali Alimardon in Dushanbe, Tajikistan, to negotiate the contracts.  (CA ¶ 184).

14. As a result of these negotiations, Super Perfect and Levakan entered into a contract on February 11, 2013, which all parties had been involved in negotiating.  (CA ¶ 184; Schonberger Decl. ¶ 5, Ex. 3 ¶ 8).  Super Perfect's contract with Levakan was U.S. dollar-denominated and required a prepayment of US $5 million.  In order to protect Super Perfect's investment, the state-controlled and state-owned bank, AIB, was to issue a guarantee in the amount of US $11 million; this requirement was part of the contract with Levakan.  (*Id.* ¶ 5, Ex. 3 ¶ 9).  The contract contained an instruction to wire the prepayment through AIB's correspondent

bank account with Citibank N.Y., 399 Park Avenue, New York, NY, 10043, Account No. 3625-3384. (*Id.*, Ex. 3 ¶ 21).

15. AIB accordingly issued the Guarantee. The original Guarantee 8/2013—dated February 22, 2013— required AIB to pay Super Perfect US $11,000,000 plus 36% interest annually should Levakan fail to deliver as required by the contract. (CA ¶¶ 184-85). The original Guarantee was revised on account of corrections to clerical errors on February 28, 2013, but its material terms were unchanged (the "second Guarantee 8/2013"). Both versions of the guarantees indicated that:

> The Guarantee hereof was issued in compliance with the Civil Code of Switzerland.
>
> The Guarantee hereof shall be governed by the Swiss laws.

(Schonberger Decl. ¶¶ 6-7, Exs. 4 and 5).

16. Super Perfect and Levakan decided to split the cotton contract into two, and for this reason, Super Perfect requested two new guarantees from AIB to reflect that split. (*Id.* ¶ 8, Ex. 6). In an e-mail dated March 29, 2013, Tatiana Grudzinska, an employee of Super Perfect, wrote to Deputy AIB Chairman, Mr. Nabiev, requesting issuance of a US $6 million guarantee "in full concordance with the attached draft by means of sending it via SWIFT message to our bank BNP Paribas. Please send us a copy of that SWIFT afterwards." (*Id.*). In that same email, Ms. Grudzinska requested another guarantee for the second contract, to be issued in the amount of US $5 million, in substantially the same form as the second Guarantee 8/2013.

17. Ms. Grudzinska's email attached drafts of both newly requested guarantees. The draft SWIFT guarantee contained an arbitration clause, which reads as follows:

> ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR IN RELATION WITH THIS GUARANTEE, INCLUDING THE VALIDITY, INVALIDITY, BREACH OF TERMINATION THEREOF, SHALL BE RESOLVED BY ARBITRATION IN ACCORDANCE WITH THE SWISS RULES OF INTERNATIONAL ARBITRATION

6

OF THE SWISS CHAMBER OF COMMERCE IN FORCE ON THE DATE WHEN THE NOTICE OF ARBITRATION IS SUBMITTED IN ACCORDANCE WITH THESE RULES. THE NUMBER OF ARBITRATORS SHALL BE ONE. THE SEAT OF THE ARBITRATION SHALL BE GENEVA AND THE ARBITRAL PROCEEDINGS SHALL BE CONDUCTED IN THE ENGLISH LANGUAGE.

(CA ¶ 12; Schonberger Ex. 6).

18.   AIB replied to this request via email Super Perfect to "[P]lease send the guarantee issued by us for Levakan, so we could give you the new one." (Schonberger Decl. ¶ 9, Ex. 7). Super Perfect was informed by AIB that Mr. Alimardon, who at the time was supervising the agricultural sector of Tajikistan, had to approve the issuance of the new guarantees. (*Id.* ¶ 10, Ex. 8 ¶ 2.6).

19.   AIB provided the US $6 million with the language proposed by Super Perfect and BNP Paribas ("SWIFT Guarantee 8/2013") to Super Perfect via email (*id*. ¶ 12, ex. 10) and handed a copy of both the SWIFT Guarantee 8/2013 and the US $5 million guarantee ("Guarantee 9/2013") to Ms. Grudzinska in person. (*Id.* ¶¶ 10-11, Ex. 8 ¶¶ 2.6-2.18; Ex. 9 ¶¶ 5.28-5.31).   AIB informed Ms. Grudzinska that the SWIFT Guarantee 8/2013 had been sent to BNP Paribas as requested.  (*Id.* ¶ 10, Ex. 8 ¶ 2.9).  She then handed back the second Guarantee 8/2013 to AIB.  (*Id.* ¶ 10, Ex. 8 ¶2.19).

20.   Super Perfect performed its prepayment obligations under the contracts with Levakan, but Levakan failed to deliver the cotton as promised and refused to return the prepayment.  (*Id.*  ¶ 13, Ex. 11 ¶¶ 35-36).  Super Perfect therefore sought to collect US $11 million as provided for in the guarantees, but AIB refused to honor them.  (*Id.*, Ex. ¶¶ 42-49).

21.   AIB disavowed the issuance of the SWIFT Guarantee 8/2013 and Guarantee 9/2013, despite informing Super Perfect that they had been signed by AIB and that the SWIFT

7

Guarantee 8/2013 had been sent to BNP Paribas, claiming that there had been an intent to issue them, but that they were never issued in valid form. (CA ¶ 33).

### b. Initiation of Arbitration & Initial Proceedings

22. Super Perfect served a Notice of Arbitration on the Secretariat of the court of the Swiss Chambers' Arbitration Institution in accordance with the SWIFT Guarantee 8/2013 on November 6, 2014, thus formally commencing arbitral proceedings pursuant to Article 3(2) of the Swiss Rules. Super Perfect applied for an order requiring "Agroinvestbank Open Joint Stock Company to pay Super Perfect Investments Limited the principal amount of USD 11,000,000." (CA ¶ 21). On November 7, 2014, the Secretariat notified the parties of the receipt of the Notice of Arbitration and enclosed a copy for AIB, whom the Secretariat invited to file an answer in response to the Notice. (CA ¶ 22).

23. On December 10, 2014, AIB filed its Answer to the Notice of Arbitration with the Secretariat, and on January 6, 2015, AIB sent another copy to be provided to the arbitrator. In its Answer, it raised several substantive defenses on the merits, including the contention that the second Guarantee had been cancelled, and that the SWIFT Guarantee 8/2013 and Guarantee 9/2013 had never been issued. (CA ¶ 23).

24. On January 12, 2015, the Secretariat informed the parties that the court of the Swiss Chambers' Arbitration Institution had appointed Professor Dr. von Ziegler as Sole Arbitrator pursuant to Article 7(3) of the Swiss Rules. (CA ¶ 25). On January 30, 2015, the Sole Arbitrator sent correspondence to the parties introducing himself, proposing dates for a procedural hearing and ordering the parties to pay in equal shares an advance on the costs of the arbitration. (CA ¶ 26). Although tracking information showed that AIB received the Sole Arbitrator's letter on February 9, 2015, it did not respond. Super Perfect both supplied its preferred date and paid its

share of the advance.  The Sole Arbitrator again wrote to Respondent on February 27, 2015, setting an additional deadline for Respondent to provide input on the dates for a procedural hearing, and noting that, absent a reply from AIB, the date for the procedural hearing would be fixed as proposed in the Sole Arbitrator's initial correspondence.  (CA ¶¶ 27-29).  Respondent again did not reply, although tracking reports showed that it had received the Sole Arbitrator's letters.

25.     The Sole Arbitrator sent another letter to the Parties on March 13, 2015, in which he set the date for the first procedural hearing as April 15, 2015.  He also included notice to the parties of the Specific Procedural Rules and a Provisional Timetable for the arbitration, as well as a statement indicating the basis for Petitioner's claim of jurisdiction—the arbitration clause in the SWIFT Guarantee 8/2013.  Super Perfect consented to the proceedings.  (CA ¶¶ 30-31).  On April 1, 2015, Respondent responded, acknowledging receipt of the procedural order and declining to pay its share of the costs.  Instead, AIB repeated the defense raised in its Answer: "that the bank guarantees have been issued informally and in violation of existing procedures and in improper form, therefore, we categorically do not accept the Claimant's claims."  (CA ¶ 33).  AIB also said that Levakan should be party to the arbitration (even though Levakan was not a party to the guarantees).  AIB did not attend the procedural hearing on April 15, 2015, but having raised no objections to the draft Procedural Order or Provisional Timetable, the Sole Arbitrator executed the rules and timetable, and sent notice of the same to the Parties.  (CA ¶¶ 33-34).

26.     The Sole Arbitrator considered submissions by both parties on the issue of whether to join Levakan to the proceedings, and on May 4, 2015, decided against joinder, since the supply agreements between Petitioner and Levakan had no bearing on AIB's performance of its own obligations under the guarantees.  (CA ¶ 40).

9

27. Petitioner submitted its Statement of Claim on June 1, 2015, and Respondent—after requesting and receiving an extension—submitted its Statement of Defense on August 14, 2015. Respondent received another extension to submit witness statements and expert reports. (CA ¶ 49). Respondent paid its share of the advance costs on September 22, 2015. (CA ¶ 57).

28. Respondent demanded bifurcation of the proceedings in order to determine whether the arbitral tribunal had jurisdiction, an argument raised by Respondent's new counsel, the Gentium Law Group, which sought to "preserve[] its jurisdictional objections to the wholly misconceived contractual premises upon which these proceedings are pursued." (CA ¶¶ 46-47). The Sole Arbitrator honored Respondent's request to brief the issue of jurisdiction and invited a second exchange of briefs on that issue and the merits.

29. The Parties held a second Procedural hearing on October 29, 2015, in which all parties participated. (CA ¶ 63). Over the course of the next year, the Parties submitted evidence, including expert witness reports, during which time the Sole Arbitrator indulged Respondent with extensions to comply with the dates set forth in the Procedural Orders. (CA ¶¶ 77, 80, 84).

30. The merits hearing was conducted from June 6 to 9, 2016. (CA ¶ 104). On the last day of the evidentiary hearing, both Petitioner and Respondent acknowledged that they had no objections to the way the proceedings had been conducted. (CA ¶ 107). Respondent's counsel briefly withdrew from representation in May, June and August 2016. (CA ¶¶ 98, 103, 105, 100, 118). Petitioner filed its post-hearing brief on August 16, 2016; Respondent was denied an extension and did not submit one. The Sole Arbitrator declared the proceedings closed on August 31, 2016. (CA ¶ 124).

### *c. Findings on Jurisdiction*

31. The Sole Arbitrator first determined that he had jurisdiction over Respondent. He arrived at this decision by employing a rigorous and thorough analysis of Respondent's conduct in the arbitral proceedings. The general rule of jurisdiction under Swiss law is that it must be based on the arbitration agreement. (CA ¶ 141). The arbitration clause in the SWIFT Guarantee 8/2013 established the jurisdiction of the tribunal, but Respondent contested the validity of that agreement. The Sole Arbitrator instead considered that jurisdiction may be established by conduct, "irrespective of the existence of a valid arbitration agreement." (*Id.*). According to Article 186(2) of the Swiss Private International Law Act, which governed the arbitration, any challenge to jurisdiction is required to be made in the Answer to the Notice of Arbitration, "especially where [the Answer] includes a defence on the merits," as Respondent's Answer did in this case. (CA ¶ 133).

32. The Sole Arbitrator engaged in the analysis of whether Respondent had submitted to the tribunal's jurisdiction using the same "high standard set by the Swiss Supreme Court for interpreting arbitration agreements." (CA ¶ 154). Under that standard, an intent to submit to the jurisdiction of an arbitral tribunal must be expressed by "an unambiguous statement of the respondent that it is presenting arguments on the merits." (*Id.*). This is a "fairly highly and restrictive" standard, and not lightly assumed. (*Id.*). The Sole Arbitrator found that Respondent had consented to jurisdiction by conduct because it i) engaged in the merits by arguing that the bank guarantees were not valid (CA ¶ 162); ii) demanded the impleading of Levakan, which would make no sense if Respondent believed the tribunal to lack jurisdiction (CA ¶ 165); iii) cited to the Swiss Rules when drafting its response, including Rule 3(7), which sets forth the requirement for raising jurisdictional objections (CA ¶ 163); and iv) did not even raise an

objection to the jurisdiction of the Sole Arbitrator in response to Procedural Order No. 2, which stated that "Respondent did not raise any objection to the jurisdiction of the Sole Arbitrator." (CA ¶ 166). The objections raised in the Statement of Defence were too late to comply with the rules and governing law. (CA ¶¶ 181-83).

### d. Findings on the Merits

33. Having established that he had jurisdiction, the Sole Arbitrator then turned to the merits of the claim, that is, were AIB's guarantees valid and enforceable, and if so, what were its obligations thereunder. Super Perfect sought the payment of US $11 million, interest at 36% compounded annually from February 25, 2014, the additional principal amount of US $1,740,779.70 and all costs of the arbitration. The Sole Arbitrator found that Super Perfect was entitled payment of the US $11 million, but struck the 36% contractual interest rate down to the legal Swiss rate of 18%, calculated at a simple annual rate, not compounded. The Sole Arbitrator also ordered AIB to pay the costs of the arbitration.

34. The Sole Arbitrator reached this determination by assessing the validity of the second Guarantee 8/2013—Petitioner alleged that if AIB maintained that the SWIFT Guarantee and Guarantee 9/2013 had, contrary to their prior representations, never been issued, then the second Guarantee 8/2013 was still valid. Respondent claimed that it had been cancelled when the underlying contract for the purchase of cotton was split into two. Petitioner adduced evidence, however, that it requested and received the new guarantees, and it never would have agreed to terminate the second Guarantee 8/2013 unless AIB issued valid replacements. In Petitioner's view, either the second Guarantee remained valid, or the SWIFT Guarantee 8/2013 and Guarantee 9/2013 were valid. AIB contended, conversely, that Petitioner had returned the second Guarantee 8/2013, thereby cancelling it. The presumption in favor of the preservation of guarantees, and the

supporting evidence, persuaded the Sole Arbitrator that at all times, AIB remained liable under the second Guarantee 8/2013.

35. Petitioner had alleged that the Respondent issued an oral bank guarantee at the meeting of December 6, 2012, in the office of Mr. Alimardon. The Sole Arbitrator was not persuaded by this argument and found that the Parties had only agreed that such guarantees shall be issued in the future (CA ¶¶ 197, 201). The same reasoning led the Sole Arbitrator to rule in favor of Petitioner with respect to the continuing validity of the second Guarantee 8/2013. Both Parties agreed that AIB duly issued the original Guarantee 8/2013 for US $11,000,000 on February 22, 2013, and that, because of typos and mistakes, the guarantee was returned to Respondent and reissued as the second Guarantee 8/2013 on February 28, 2013. (CA ¶ 203). Because there was consensus on this point, the Sole Arbitrator readily concluded that the existence of the original Guarantee 8/2013 did "not have to be considered any further." (CA ¶ 204).

36. The dispute centered on whether the second Guarantee 8/2013 remained valid. The Parties agreed that the Sole Arbitrator should apply Tajik law to this issue. The second Guarantee 8/2013 had a contractually stipulated interest rate of 36%, and both bore the seal of AIB and the signature of then-Chairman Mr Soliev. (CA ¶ 205). Respondent claimed that there was a novation effected by SWIFT Guarantee 8/2013 and Guarantee 9/2013, while at the same time arguing that they were never issued. (CA ¶ 207). According to AIB, the Petitioner canceled the second Guarantee 8/2013 when it tendered it back to an agent of AIB for amendment or reissuance of the new guarantees. AIB further contended that the second Guarantee 8/2013 was not valid either for lack of proper signatures. (CA ¶ 208). In AIB's view, it had no liability whatsoever.

37.     The Sole Arbitrator found that the second Guarantee 8/2013 was validly entered into; the correction of "minor clerical errors . . . did not change or amend any substantive content that would have required a renewed approval of a signatory with full authority."  (CA ¶ 222).

38.     He also found that if the SWIFT Guarantee 8/2013 and Guarantee 9/2013 were never issued, then the second Guarantee 8/2013 was never terminated.  None of the evidence supported the claim that there was a "common intention . . . to extinguish the second Guarantee 8/2013."  (CA ¶ 229).  This is because at no point was there a discussion of having no guarantee, but only replacing the second Guarantee 8/2013 with two new guarantees which would equal the amount of the second Guarantee 8/2013.  (CA ¶¶ 231, 233).  In the Sole Arbitrator's view, a reasonable third person would assume that handing back the second Guarantee 8/2013 was not a termination, but rather "a prerequisite to eventually replace the second Guarantee 8/2013 in the future, i.e. one the two new guarantees would be duly issued."  (CA ¶ 233).

39.     This conclusion comported with the standards of scholars on the extinction of agreements; without the actual issuance of replacement guarantees, Petitioner's alleged surrender of the second Guarantee 8/2013 would have been extinction without consideration, and the Sole Arbitrator failed "to see why Claimant would have agreed to extinct the second Guarantee 8/2013 without consideration and in fact conclude[d] that the evidence presented by Respondent does not support such an assumption."  (CA ¶¶ 236, 244).

40.     The alteration of the underlying cotton supply contracts—the division into two contracts—did not operate to extinguish the second Guarantee 8/2013.  Under Swiss law, which the Parties chose to apply to the case, there is a presumption in favor of guarantees.  (CA ¶ 248).  Applying the relevant law—Article 111 CO—the Sole Arbitrator noted that "the contract of guarantee is an independent obligation, distinct from the underlying obligation."  (CA ¶ 251).  He

determined that "the main duties for which a guarantee was sought and obtained did not change due to the amendments to the LM contract and that, thus, Respondent's risks were not altered." (CA ¶ 257). Respondent was therefore not exempt from its obligations under the second Guarantee 8/2013.

41. Although the second Guarantee 8/2013 was valid and enforceable, the Sole Arbitrator found that its interest rate was not. Under Swiss law, as promulgated by the Swiss Supreme Court, only "special, decisive circumstances" that were not present here could justify interest rates above 18%. (CA ¶¶ 269-69). The Sole Arbitrator reduced the interest rate to an 18% simple interest rate. (CA ¶¶ 271-72).

42. Petitioner did not prevail in its claim for lost profits because the Sole Arbitrator determined that the evidence presented was inconclusive, and pertained only to "missed opportunities," which are not compensable under Swiss law. (CA ¶ 275). Petitioner's civil liability claims were dismissed, found to be duplicative of the contract claim upon which it prevailed. (CA ¶ 281).

   e. *The Award*

43. In keeping with the Swiss Rules on arbitration, the losing party was required to pay the costs of the arbitration, including the attorneys' fees of Petitioner. (CA ¶¶ 302, 306).

44. The Award was made as follows:

   a. The Sole Arbitrator has jurisdiction for all claims raised by Claimant in the present proceeding.

   b. The Respondent is ordered to pay to the Claimant the amount of USD 11,000,000 plus interest in the amount of 18% per annum as from 25 February 2014 until full and final payment.

  c. The Respondent is ordered to pay to the Claimant the amount of USD 193,394.00 for the costs of the arbitral proceedings.

  d. The Respondent is ordered to pay to the Claimant the amount of USD 546,274.57 for legal costs and other expenses incurred in relation to the arbitration.

  e. All other requests and claims are dismissed.  (CA ¶308).

45. The Award was made by Sole Arbitrator on July 17, 2017.

## THE AWARD SHOULD BE CONFIRMED BY THIS COURT

46. With interest to date under the terms of the Award, AIB owes Super Perfect US $24,565,668.57.  (Schonberger Decl. ¶ 19).

47. The Award has not been set aside or suspended by a competent authority of the country in which, or under the law of which, the Award was made.

48. The Award is final, binding and subject to enforcement.

49. Pursuant to 9 U.S.C. § 207, Petitioner has brought this action within three years after the Award was made on July 17, 2017.

50. Respondent has not complied with its obligations under the Award.

51. On March 16, 2018, Super Perfect sought to enforce the Award before the Economic Court of Dushanbe City in Tajikistan, but it was refused, even though the Award comported with Tajik law and was required to be enforced under the New York Convention, to which Tajikistan is a party.  (Schonberger Decl. ¶ 15, Ex. 13).  Super Perfect appealed to the Supreme Economic Court of the Republic of Tajikistan on June 28, 2018, but it, too, refused to enforce the Award.  (*Id.*).

52. Mr. Schonberger, as General Director of Super Perfect, filed a Request for Arbitration against the Republic of Tajikistan in the International Centre for the Settlement of

Investment Disputes on February 8, 2019, seeking to enforce the Award and claiming expropriation. (*Id.*). That proceeding remains pending but has been stayed by agreement of the parties thereto. (*Id.*).

53. In the interim, Super Perfect has sought to reach a resolution with AIB, but AIB has been unable to comply because it is subject to the control of the Republic of Tajikistan, which refuses to pay or authorize assets sufficient to compensate Super Perfect. When Super Perfect sought to collect the Award, AIB represented to Super Perfect that payment on the Award required the approval of the government of Tajikistan and the Ministry of Finance. (Schonberger Decl. ¶¶ 14, 16-17, Exs. 12, 14-15). And although AIB made a partial payment on the Award,[1] and offered up real estate in lieu of cash payment, that offer was subject to the approval of "authorized persons in the Republic of Tajikistan" and has not materialized. (*Id.* ¶ 15, Ex. 13).

54. As set forth more fully in the accompanying Memorandum of Law, Petitioner is entitled to an order recognizing and enforcing the Award on the authority of 9 U.S.C. § 207 and Article III of the New York Convention.

## PRAYER FOR RELIEF

Wherefore, Petitioner Super Perfect respectfully requests:

a)   An Order recognizing and enforcing the Award (and entering Judgment thereon;

b)   entering judgment in Super Perfect's favor against Agroinvestbank Open Joint Stock Company in the amount of the Award with interest as provided therein;

c)   as award of Petitioner's costs of this civil proceeding, including reasonable attorneys' fees incurred in bringing this proceeding;

---

[1] A total of US $200,000 has been paid and shall be credited in the enforcement of the Award.

      d)      an Order retaining jurisdiction in the Court over this action for any further proceedings as necessary to enforce the Award; and

      e)      granting Super Perfect such relief as the Court deems just and proper.

A proposed order is appended hereto.

Dated: July 17, 2020

New York, New York

          Respectfully submitted,

          LEWIS BAACH KAUFMANN MIDDLEMISS pllc

          By: s/ Tara J. Plochocki

          Tara J. Plochocki (NY Bar #5359054)
          1101 New York Avenue NW
          Ste 1000
          Washington, DC. 20005

          Mackenna White (NY Bar #4799953)
          Chrysler Building
          405 Lexington Ave, 64th Floor
          New York, New York  10174